## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 24-cr-255 (TSC) |
| | : | |
| OBINNA OGBU, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Obinna Ogbu, now fifty-three years old, immigrated to this country as a young man to find new opportunities and improve his quality of life, after growing up in a rough neighborhood in Nigeria. Upon his arrival in the United States, he maintained steady employment in the Information Technology ("IT") sector. He consistently took on new positions that increased his skill set and added to his job responsibilities and qualifications. In the process, he primarily raised his two sons, who live with him.

Unfortunately, the pressures of work and life led Mr. Ogbu to a pattern of lapses in judgment, clear conflicts of interest, and terrible choices, the consequences of which he will live with for the remainder of his life. While working for the Washington Metropolitan Area Transit Authority ("WMATA"), Mr. Ogbu, acting in concert with two other individuals, began to improperly steer government contracts towards companies controlled, staffed, and operated by him and his coconspirators. Having witnessed fraud and mismanagement in the way WMATA conducted its business, Mr. Ogbu saw an opportunity to advance his own career and assist a friend, and entertained the misguided justification that why should others — and not him — receive additional compensation and recognition for the dedicated work that he provided WMATA.

He was wrong and his actions are neither justifiable nor excusable. Even though Mr. Ogbu was *not* stealing money from WMATA or falsifying invoices for work that was never done, the mere steering of contracts to entities that he and his codefendants serviced, in and of itself, deprived the Government and the public of a fair and open bidding process. And he will have to live with the consequences of his actions, including the loss of employment, the public shame from the numerous news stories written about his arrest and prosecution, a felony conviction that will limit his future employment opportunities, significant restitution and forfeiture obligations, and the possibility of being incarcerated and away from his children, who look to him for support and guidance.

The true measure of an individual's character is not actions taken or regrets made *at the time of sentencing*, but in how an individual accepts responsibility when confronted with his or her criminal wrongdoing. In this case, Mr. Ogbu sincerely accepted responsibility and squarely placed himself on the road to redemption by agreeing to cooperate with the Government in its investigation. To this day, Mr. Ogbu has never been formally arrested. He voluntarily went to the United States Attorney's Office and met for multiple days with the Government. He answered all questions posed to him completely and truthfully and described in those answers: (i) his knowledge and history of his coconspirators and the various roles they played in the conspiracy; (ii) the various components of the bidding process, contract awards, and financial transactions underlying the honest services fraud charges in this case; and (iii) the internal structure of the governmental entities that allowed for the fraud to occur.

Mr. Ogbu did not demand discovery, nor has he ever requested, viewed, or received a single Federal Bureau of Investigation ("FBI") report from the Government's lengthy investigation. Without hesitation, he entered into a cooperation plea agreement with the Government and pleaded

2

guilty at his *initial* court appearance. The information provided by Mr. Ogbu substantially assisted the Government's investigation, its subsequent charging of Mr. Ogbu's coconspirators, and its success in obtaining guilty pleas as to those individuals. The information also provided the Government with additional investigative leads. Additionally, Mr. Ogbu was ready, willing, and tentatively scheduled to appear as a grand jury witness for the Government in its prosecution of his codefendants and would have testified at their trials, if that too was necessary. The value of Mr. Ogbu's assistance is exemplified by the Government's motion for a downward departure, which requests from this Court a sentence below the sentencing guidelines that would otherwise apply to Mr. Ogbu in this case, pursuant to section 5K1.1 of the United States Sentencing Guidelines.

Mr. Ogbu knows that he must face the consequences of his actions. He simply asks that this Court take into consideration *the entirety* of his life and his actions in accepting responsibility at the earliest possible stage and while providing substantial assistance to the Government. The letters accompanying this submission also attest to Mr. Ogbu's history of kindness and service to others, confirm that he is a devoted and loving father to two young men, and highlight that the conduct in this case is completely inconsistent with his otherwise lawful life.

Cooperation and pre-arrest acceptance of responsibility are valued and cherished by the Government. For this reason, the Sentencing Guidelines make exceptions for these unique and special cases when reporting statistics. Moreover, in this jurisdiction, cooperation is valued and rewarded significantly. If cooperators in drug trafficking organizations and seditious conspiracies can receive probationary sentences for their substantial assistance to the Government, so too can Mr. Ogbu, who, absent the charged conduct in this case, has lived an otherwise lawful life.

As discussed in further detail below, Mr. Ogbu respectfully submits that a term of

probation, in lieu of incarceration, is reasonable and appropriate, serves the interest of justice, and would afford him the opportunity to continue to be a productive member of society, meet his restitution obligations, and take care of his two sons, who he has primarily raised and who live with him and rely on his love and support.

## FACTUAL BACKGROUND

### Personal Life and Family History

Mr. Ogbu was born in Enugu, Nigeria in 1971. *See* Presentence Report ("PSR") ¶ 87 (D.E. 14). He grew up in a rough area in the lower section of town, where he witnessed drug use and criminal activity, including killings. *Id.* ¶ 88. Although his parents, both employees of the Nigerian government, were able to provide the basic necessities, Mr. Ogbu and his four younger siblings started working at a young age to help support their family. *Id.* Notwithstanding the financial and environmental difficulties, Mr. Ogbu had a stable childhood, with gracious parents who regularly helped others in need. *Id.*

When Mr. Ogbu was 24 years old, he won the visa lottery and was granted the opportunity to immigrate to the United States from Nigeria. *Id.* ¶ 92. He entered the country on August 29, 1995, and has resided in the DC metropolitan area ever since. *Id.* On October 18, 2002, Mr. Ogbu became a naturalized United States citizen, while also maintaining his Nigerian citizenship. *Id*. His parents and siblings stayed in Nigeria, though his father passed away in 2017. *Id.* ¶ 87. Mr. Ogbu enjoys a close relationship with his mother and several siblings. *Id.*

Mr. Ogbu was married for two years in his early twenties, but the marriage ended in divorce after his wife started a new relationship. *Id.* ¶ 90. In 2001, Mr. Ogbu married Helen Maduka. *Id.* The pair eventually grew apart and divorced in 2014. *Id.* They have two sons together, Obinna Ogbu, Jr. (age 22) and Omari Ogbu (age 19), both of whom now reside with Mr. Ogbu in Silver

Spring, Maryland. *Id.* Although they are no longer minors, Mr. Ogbu still supports both of his sons financially while they attend college. *Id.* Obinna Jr. completed a term at Montgomery College and is finishing his degree at Towson University, and Omari is enrolled at Montgomery College. *See id.* In addition to financial support, Mr. Ogbu's sons rely on him for guidance and stability.

### Education and Work Experience

In 1986, Mr. Ogbu earned his high school diploma from the Federal Government College in Okigwe, Nigeria. *Id.* ¶ 102. He then attended the Federal University of Technology in Owerri, Nigeria from 1987 to 1992, earning the equivalent of a bachelor's degree. *Id.* Mr. Ogbu enrolled in the University of Maryland to study information systems in 2001. *Id.* He stopped attending school in 2002 because he had a young child and his then-wife, Helen (Maduka) Ogbu, had been diagnosed with breast cancer. *Id.*

From 2001 to 2015, Mr. Ogbu worked for the International Finance Corporation in Washington, DC as a Service Delivery Manager. *Id.* ¶ 108. From 2014 to 2016, he was employed as a Help Desk manager for Catholic University in Washington, DC. *Id.* ¶ 107. Thereafter, Mr. Ogbu worked for WMATA, until his resignation in 2024. *Id.* ¶¶ 105-06. Mr. Ogbu had been suspended with pay and believed the appropriate decision was to resign his employment and stop receiving his paycheck, given that he was prepared to publicly acknowledge his wrongdoing as part of a cooperation plea agreement with the Government.

Mr. Ogbu holds IT and Microsoft System Engineer and Software certifications. *Id.* ¶ 103. He previously held Project Manager, Help Desk, and Cyber Security licenses. *Id.*

### Complete Acceptance of Responsibility

Besides giving a complete and full accounting of all facts relevant to the Government's investigation and certain information completely unknown to the Government prior to entering

into a cooperation agreement, Mr. Ogbu, from the moment of his first meeting at the United States

Attorney's Office with his counsel, has completely and sincerely accepted responsibility, which is

no greater memorialized than in his letter to the Court, an excerpt of which is enclosed below:

### Mr. Ogbu's Letter to the Court (Ex. 1)

I am profoundly regretful and disappointed in myself for straying from the values I have always strived to uphold. My actions have not only brought shame upon myself but have also affected those who depend on me most—my two sons. As a single father, my primary focus has always been to provide a stable and nurturing environment for my children. . . . I am truly devastated to have brought this additional turmoil to their lives. . . .

I am committed to making amends for my actions, both personally and legally, and demonstrating to my children the importance of taking responsibility when one has done wrong. Moving forward, I plan to dedicate my life to being a better father and a contributing member of society. I am ready to accept whatever sentence the Court deems appropriate, but I humbly ask to be granted the opportunity to be present in their lives, to guide them, and to teach them valuable lessons about integrity and accountability.

I fully understand the seriousness of my actions and that trust is not easily regained. I will never forget the lessons this situation has taught me, and I am fully committed to using this experience as a catalyst for positive change and to make meaningful contributions to society moving forward.

### <u>Support of Family and Friends</u>

Accompanying this submission are letters of support from Mr. Ogbu's lifelong friends,

Adrienne Kennedy (Ex. 2), Benjamin Nworgu (Ex. 3), Hendrix Akalonu (Ex. 4), Ndukwe Amaoji

(Ex. 5), Chuma Mmeje (Ex. 6), Obiora Ogbu (Ex. 7), and Azubuike Henry Ogbuokiri (Ex. 8), and

his ex-wife, Helen (Maduka) Ogbu (Ex. 9). All these individuals discuss at length what a

wonderful, kind, and generous person Mr. Ogbu is and how they believe in him and support him

in this most challenging time in his life. Short excerpts of each of these letters highlight the history

and characteristics of Mr. Ogbu that he asks this Court to consider in fashioning an appropriate

sentence in this case:

### Adrienne Kennedy (Ex. 2)

Over the years, I have come to deeply admire and respect Obi for his intelligence, kindness, and integrity. I can attest to his strength of character, his unwavering commitment to his family, and his sincere remorse for the unfortunate incident that has led him before you. Obi is not only a devoted friend, but also a loving and dedicated father to his sons, who depend on him. . . . In personal matters, he has always been a dependable and caring individual, never hesitating to lend a hand when others are in need. . . . The incident that brings Obi to court is entirely out of character for the man I have known for over two decades. It was an unfortunate and isolated lapse in judgment, influenced by circumstances that he deeply regrets.

### Benjamin Nworgu (Ex. 3)

Throughout my relationship with Obinna, I have known him to be a person of integrity, kindness and responsibility. As a single father taking care of two teenage boys, he has always shown a great understanding of what it takes to make sure that his boys grow up to be good and responsible adults. I am truly honored to have him as a friend. . . . I believe that this incident does not reflect the person that Obinna truly is. It truly does not represent the person that I know. Obinna is genuinely remorseful for his actions and has made efforts to change. He is determined to become a better person as a result of this experience.

### Hendrix Akalonu (Ex. 4)

His advice proved invaluable, not only to me but to my family. . . . He has always been eager to help others succeed, frequently offering career advice and going the extra mile to research and share resources that promote professional development. . . . As a father, Obi has cultivated excellent relationships with his sons. When I met his boys, I was impressed by their maturity and the bright young men they are becoming under his guidance. I am aware of the circumstances that have brought him before this court. Knowing the person he is, I cannot reconcile these actions with the man I have known for over a decade. I believe this is an isolated incident, not reflective of his true character, and I am confident it will not be repeated. I respectfully ask the court to extend leniency in its judgment.

### Ndukwe Amaoji (Ex. 5)

When Obinna informed me of the unfortunate circumstances surrounding this case, I was genuinely shocked. Before this, he has always been a law-abiding citizen and an active, supportive member of our community. He is a devoted father who cares deeply for his two boys . . . [.] Obinna's generosity extends beyond his immediate family—he consistently helps those around him, regardless of their background. For instance, a few years ago, he was introduced to a young orphaned girl whose guardian had horrifically injured her. Without hesitation, Obinna stepped in to cover her medical and educational expenses, supporting her until she graduated last

year. . . . He deeply regrets the actions that have brought him before this court and has shown sincere remorse for the harm caused. In the past months, I have . . . witnessed firsthand the changes in his outlook and behavior. He has taken full responsibility for his actions and is actively working to improve himself through counseling and community service.

### Chuma Mmeje (Ex. 6)

Obinna and I grew up together. . . I was honored to be the best man at his wedding, and Obinna graciously stood by my side as the best man at mine. . . . He has been a loyal and trustworthy friend, never engaging in any activities that would put him at odds with the law. As the eldest son in his family, Obinna is a role model, especially to his two sons, his siblings, and his mother, who relies on him since the passing of her husband. Obinna's dedication to his family is a testament to his character, as he consistently supports them both emotionally and financially. . . . Given Obinna's longstanding history of good behavior and his deep connections with his family and community, I humbly request that you consider leniency in his sentencing. Obinna's character, as I have known it for the past five decades, has always been above reproach. His dedication to his family and his contributions to his profession and community are clear indicators of his genuine desire to live as a responsible and law-abiding citizen.

### Obiora Ogbu (Ex. 7)

I have known Obinna Ogbu for 15 years, and . . . he has proven himself to be a dedicated father to his two children, a hardworking individual, and a valued member of our community. He has worked his way up honestly from humble beginnings, overcoming obstacles through perseverance, intelligence, and sheer determination. His character is marked by kindness, generosity, and a willingness to lend a helping hand to those in need. He has often been the light for many in our community, always seeking ways to uplift and support those around him. . . . I truly believe that this experience has already been a powerful lesson for him, and with the right guidance and grace, he will emerge from this a better, more accountable person who would never repeat such actions.

### Azubuike Henry Ogbuokiri (Ex. 8)

His great attributes of KINDNESS, COMPASSION and COMMITMENT has stood out in his work ethics and his relationship with people around him. Mr. Obinna Ogbu is a proud single parent of 2 handsome young adults. He has worked tirelessly to provide education to his 2 boys to make them better citizens with respect and integrity to rules of law. Since the unfortunate incident Mr. Obinna Ogbu got involved in, his life has taken a downturn. The situation has tremendously affected him Physically, Emotionally and Socially. His total life has changed.

Mr. Ogbu's ex-wife and the mother of his children also wrote a letter of support for the Court's consideration:

**Helen Ogbu** (Ex. 9)

Very early in our acquaintance he exhibited honorable character traits. He had and has maintained a zeal to work, intelligence, thoughtfulness, and a speed for learning new and challenging tasks. These traits have endeared him to many and remained evident as he excelled at different career and personal goals. . . . Our children Obinna Jr and Omari are respectful young men who make me proud with their academic achievements. . . . I am reminded daily of all the challenges they have witnessed. My sons watched me battle breast cancer at a fairly young age. They weathered with me the storms of uncertainty after multiple surgeries and lengthy chemotherapy treatments. Shortly thereafter, they watched their father, and I dissolve our marriage, begin visitation and shared custody. Many questions and years' post-divorce, we are still trying to sooth the sting of adult failures that led to their shattered dreams and expectations. Beyond our immediate family, Obinna is a pillar in his family. For as long as I can remember he has been the head of his family in Nigeria. The second of six children but the first son of his aged, widowed mother, He now more than ever bears the burden and responsibility of her welfare in Nigeria. Obinna is also tasked with assisting his immediate junior sister with raising three (3) children, she is also a widow. Mr. Ogbu's role as a father, provider, advisor, and counselor are huge endeavors that have a direct impact so many people here in the US and abroad in Nigeria. . . . Your Honor, the Obinna I know has a profound respect for the laws that govern our society. He is truly ashamed of what has happened. He bears the shame and embarrassment of his actions; he has become reclusive and shell of his outgoing boisterous self. Without any doubt, I am sure he would do anything to resolve and make amends for his offenses.

All these letters of support identify Mr. Ogbu as a kind and decent man who, while making a series of terrible mistakes, is not a terrible person or a danger to society that requires incarceration. Mr. Ogbu's own letter (*see* Ex. 1), where he expresses genuine remorse for his actions, provides an overview of his life, and asks this Court to please consider his assistance to the Government, his acceptance of responsibility, and his two boys (pictured below), when rendering his sentence in this case.



### **Nature and Circumstances of the Charged Offense**

As described in the stipulated facts agreed to by Mr. Ogbu, from 2018 to 2024, Mr. Ogbu worked at WMATA as an IT Customer Support Manager. While at WMATA, Mr. Ogbu met fellow employee Bridgette Crowell, who was a contract administrator. Mr. Ogbu and Ms. Crowell began a romantic relationship in 2017. Mr. Ogbu was also friends with lfediora Oli, who was the Principal Officer of Highbury Global Group, Inc. ("Highbury"). In addition, Mr. Oli worked for the United States Department of Agriculture ("USDA") as an engineer.

After Ms. Crowell stopped working at WMATA in 2019, she started working at the District of Columbia Office of Contracting and Procurement ("OCP") as a contracting specialist. In this capacity, Ms. Crowell worked within OCP to help manage government contracting activities such as advertising, negotiation, price analysis, bid selection, and contract implementation. Ms. Crowell worked at OCP as a contracting specialist until the fall of 2023.

In July 2021, Mr. Ogbu created the Nupath Company. He did so with the knowledge of Ms. Crowell and Mr. Oli, and with the intent of obtaining contracting business for his benefit. Together Mr. Ogbu, Ms. Crowell, and Mr. Oli worked to steer government contracts to their respective companies to financially benefit the group in violation of policies governing fair bidding processes and in violation of protocols pertaining to their obligations as government employees.

Various financial payments were made between the parties to facilitate the sharing of benefits from the proceeds of government contracts and various forms of concealment were undertaken to prevent their actions from being discovered.

Following the execution of a search warrant at his residence, Mr. Ogbu, with the assistance of counsel, contacted the Government about seeking to cooperate in its investigation. Mr. Ogbu met with the Government and federal agents at the United States Attorney's Office for two full days. He answered all questions posed to him completely and truthfully and described in those answers: (i) his knowledge and history of the above-referenced coconspirators and the various roles they played in the conspiracy; (ii) the various components of the bidding process, contract awards, and financial transactions underlying the honest services fraud charges; and (iii) the internal structure of the governmental entities that allowed for the fraud to occur.

Mr. Ogbu also interpreted and provided context to various documents obtained by the Government during its investigation and acknowledged to receiving money for his assistance in having business directed to coconspirator Oli. While certain of this information was already known to the Government and confirmed by Mr. Ogbu, certain information, such as, in-person conversations between the parties and the nature of payments, could have only been learned from Mr. Ogbu's cooperation and meetings with the Government. Mr. Ogbu also provided detailed information regarding the contracting and delivery of energy products to the Defense Logistics Agency and the regulatory framework in African nations to ensure the delivery of items to those foreign governments.

The above-referenced information was extremely beneficial to the Government's investigation, its subsequent charging of coconspirators Oli and Crowell, and its success in obtaining guilty pleas as to both coconspirators. The information also provided the Government

with additional investigative leads. Mr. Ogbu was also tentatively scheduled to appear before the grand jury to assist the Government in obtaining an indictment in this case, but his testimony was ultimately deemed unnecessary when Mr. Oli agreed to plead guilty. As Mr. Ogbu's statement of offense was made publicly available on the court docket, even though his cooperation plea agreement was sealed, it likely became clear to Mr. Ogbu's coconspirators that Mr. Ogbu acknowledged his own and his coconspirators' criminal culpability in a public proceeding and was cooperating with the Government.

On May 20, 2024, Mr. Ogbu entered a guilty plea to a one-count Information for conspiracy to commit wire and honest services fraud, in violation of 18 U.S.C. § 1349.

## ARGUMENT

**I.      Mr. Ogbu's Early Acceptance of Responsibility, Substantial Assistance to and Cooperation with the Government, and Other Considerations Warrant a Below-Guidelines Sentence.**

The sole count on which Mr. Ogbu faces sentencing does not expressly require this Court to impose a term of incarceration. The sentencing factors of 18 U.S.C. § 3553 require this Court to formulate a sentence which is sufficient to accomplish the purposes of sentencing (as addressed below). Accordingly, so long as this Court determines Mr. Ogbu's sentence is sufficient as to him, it is appropriate for purposes of 18 U.S.C. § 3553(a) and takes its appropriate place in the grand scheme of the criminal justice system.

Based on Mr. Ogbu's early acceptance of responsibility, significant cooperation, and extremely limited contacts with the criminal justice system, the Court should depart or vary downward from the United States Sentencing Guidelines ("USSG" or the "Guidelines") range and impose a term of supervision in lieu of incarceration.

## A.      Sentencing Discretion and Section 3553(a) Statutory Factors.

In accordance with 18 U.S.C. § 3553(a), this Court is required to impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of the statute, which includes the need for the sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training. In addition, the statute requires the court to consider several factors in determining the appropriate sentence: (1) the nature and circumstances of the offense and the history and characteristics of the Defendant; (2) the purposes of the statute; (3) the kinds of sentences available; (4) the sentencing guidelines; (5) policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims.

The Guidelines are only advisory despite their mandatory language. *See United States v. Booker*, 543 U.S. 220, 245 (2005). A district court must therefore "consider Guidelines ranges," but is permitted "to tailor the sentence in light of other statutory concerns as well." *Id.* The Supreme Court in *Gall v. United States* outlined the process to follow:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving *both parties an opportunity to argue for whatever sentence they deem appropriate*, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he *may not presume that the Guidelines range is reasonable*. He must make an individualized assessment based on the facts presented.

552 U.S. 38, 49-50 (2007) (emphasis added) (citations and punctuation omitted).

Thus, in fashioning an appropriate sentence, this Court must consider the Guidelines along

with the other factors set forth in 18 U.S.C. § 3553(a) (*see Booker*, 543 U.S. at 260; U.S. Sentencing Commission, Guidelines Manual (Nov. 2023)) and treat the Guidelines "as one factor among several" that § 3553(a) requires courts to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

Under 18 U.S.C § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence. Further, under 18 U.S.C. § 3582(a), the Court, in considering the factors in § 3553(a) and their applicability, should recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation."

Although the Guidelines range will generally align with the objectives of the § 3553(a) factors, that is not always the case. As the Supreme Court said in *Kimbrough*:

> [I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives. *The sentencing judge, on the other hand, has greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court. He is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular case.* In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply.

552 U.S. at 109 (emphasis added) (citations and punctuation omitted).

As one district court has framed it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." *See* Terry Carter, *Rakoff's Stance on the SEC Draws Fire, Praise—and Change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

**B.      Applicable Sentencing Guidelines Range.**

The applicable Guidelines section for Count One, § 2X1.1, instructs the Court to use the base offense level for the substantive offense. *See* PSR ¶ 67. The applicable Guidelines section for the substantive offense is USSG § 2B1.1. *See id.*; USSG § 2X1.1(a). As set forth in Mr. Ogbu's plea agreement, the base offense level for Wire Fraud is 7. *See id.* ¶ 68; USSG § 2B1.1(a)(1). The base level is subject to the following adjustments:

- Ten-level increase under USSG § 2B1.1(b)(1)(F) because there was a monetary loss of more than $150,000;

- Two-level increase under USSG § 3B1.3 because Mr. Ogbu abused a position of public or private trust; and

- Two-level increase under USSG § 3C1.1 for obstructing or impeding the administration of justice.

*See* PSR ¶¶ 69, 71-72. The adjustments result in an offense level of 21. *See id.* ¶ 73. The Government has agreed to recommend a three-level decrease for Mr. Ogbu's acceptance of responsibility, pursuant to USSG §§ 3E1.1(a)-(b), resulting in a total offense level of 18. *Id.* ¶¶ 75–76, 78. Being in Criminal History Category I, his guidelines range is 27 to 33 months, and the estimated fine range is $10,000 to $100,000. *Id.* ¶¶ 7, 81.

**C.      Whether Fashioned as a Departure or a Variance, a Below-Guidelines Sentence is Appropriate in this Case.**

District courts may impose a sentence below the Guidelines range through either a "departure" or "variance." *See United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021). A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently "triggered by a prosecution request to reward *cooperation* . . . or by other factors that take the case 'outside the heartland' contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense." *United States*

*v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) (citation and punctuation omitted) (emphasis added). "A 'variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a)." *Id.* (citation omitted); *see also* USSG § 1B1.1(c).

Here, through either a departure or a variance, Mr. Ogbu should receive a sentence of supervision in lieu of incarceration.

### 1.  Mr. Ogbu is Eligible for a Downward Departure for His Substantial Assistance to the Government.

Under USSG § 5K1.1, the Court may depart from the Guidelines, "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." On October 16, 2024, the Government advised undersigned counsel that the Government's departure request was approved. Considering the Government's requested departure under the Guidelines, the Court may determine an "appropriate reduction" based on five non-exclusive factors:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5) the timeliness of the defendant's assistance.

USSG § 5K1.1(a); *see United States v. Fennell*, 592 F.3d 506, 509 (4th Cir. 2010).

No specific method is required to calculate a § 5K1.1(a) departure. *Fennell*, 592 F.3d at 509. A sentencing court "need only articulate [the] reasons" for whatever departure it chooses. *Id.*;

*see also* USSG § 5K1.1 cmt. ("The sentencing judge must, however, state the reasons for reducing a sentence under this section." (citing 18 U.S.C. § 3553(c))).

The Court is not bound by the Government's recommendation and is permitted to fashion a sentence it believes is appropriate in light of the substantial assistance and all of the statutory factors.[1] *See, e.g., United States v. Milo*, 506 F.3d 71, 77 (1st Cir. 2007) ("Once the government moves under the guidelines or statute based on substantial assistance, the district court is not bound by the government's recommendation as to how much of a reduction is proper."); *United States v. Grant*, 493 F.3d 464, 467 (5th Cir. 2007) ("[T]he sentencing court is not bound by the government's recommendation on whether or how much to depart but must exercise its independent discretion.").

Here, several factors weigh in favor of a significant downward departure from the Guidelines.

*First*, Mr. Ogbu's assistance was significant and useful. Mr. Ogbu described the roles played by the coconspirators in the charged conspiracy; the components of the bidding process, contract awards, and financial transactions underlying the honest services fraud charges; and the internal structure of the governmental entities that allowed for the fraud to occur. He also provided context to various documents obtained by the Government during its investigation, and recounted first-hand conversations and interactions that the Government could not otherwise learn about. Moreover, Mr. Ogbu provided detailed information regarding the contracting and delivery of energy products to the Defense Logistics Agency and the regulatory framework in African nations

---

[1] Even if the Government did not believe a departure was appropriate, this Court could still have taken Mr. Ogbu's cooperation into consideration under the § 3553 sentencing factors. *See United States v. Robinson*, 741 F.3d 588 (5th Cir. 2014) ("[A] sentencing court has the power to consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a § 5K1.1 motion.").

to ensure the delivery of those items to foreign governments. This information was not only extremely beneficial to the Government's investigation, its subsequent charging of Mr. Ogbu's coconspirators, Mr. Oli and Ms. Crowell, and its success in obtaining guilty pleas as to both coconspirators, but also provided the Government with additional investigative leads.

*Second*, the information provided by Mr. Ogbu was truthful, complete, and reliable.

*Third*, Mr. Ogbu's assistance was extensive. He met with the Government and federal agents at the United States Attorney's Office for two full days, answering all questions posed to him and interpreting various documents. Mr. Ogbu was also tentatively scheduled to appear before the grand jury to assist the Government in obtaining an indictment in this case, but his testimony was ultimately deemed unnecessary when Mr. Oli agreed to plead guilty.

*Finally*, Mr. Ogbu's assistance was timely. He provided several pieces of information prior to his arrest and his willingness to assist law enforcement continued and expanded upon his acceptance of a plea agreement, pursuant to which he agreed to be available to testify before the grand jury and at any eventual trial if necessary. The information assisted the Government in charging the coconspirators, and likely spurred their guilty pleas, as Mr. Ogbu's statement of offense was made publicly available on the court docket, potentially alerting Mr. Ogbu's coconspirators that he was cooperating with the Government.

Considering the Government's acknowledgment that Mr. Ogbu provided substantial assistance, a downward departure is warranted. Cooperation in this jurisdiction is valued and greatly rewarded, given the public stigma associated with those who cooperate with the Government. In this case, before Mr. Ogbu even began his cooperation, his guidelines were the same and he could have come before this Court to ask for a probationary sentence. The reward for cooperation should not be the Government still asking for jail time, while Mr. Ogbu is still in the

same position to ask for a probationary sentence. If a sentencing reduction of just ninety days from an equally culpable coconspirator was the reward for cooperation, as the Government suggests in this case, no one would cooperate in this jurisdiction.

As one district court noted: "No matter how horrible an offender's crimes, how unlikely his prospect of rehabilitation, how dangerous he might be, an informer deserves a reward for the benefit conferred on society by his assistance in investigating and prosecuting wrongdoers." *United States v. Torres Teyer*, No. 01-cr-21 (GEL), 2006 WL 3511885, at *8 (S.D.N.Y. Dec. 6, 2006). Here, the facts and circumstances in this case warrant a probationary sentence. Any alternative would fail to properly motivate individuals like Mr. Ogbu to cooperate with the Government, to forfeit discovery and the ability to challenge evidence and guidelines enhancements, and to increase their risk of retribution, whether physical or economic, all in the hope that they will ultimately be in a better position at their eventual sentencing.

## 2. Separate from a Departure, Mr. Ogbu Should Receive a Variance from the Guidelines.

Pursuant to 18 U.S.C. § 3553 (and specifically those portions of it that are applicable to this sentence), in imposing a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing, this Court is to consider the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

*    *    *

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

Here, separate and apart from his entitlement to a departure, Mr. Ogbu should receive a variance from the Guidelines, as the applicable § 3553(a) sentencing factors support a term of supervision in lieu of incarceration in this case.

### i.    Mr. Ogbu's Guidelines Range Overstates His Criminal History and Conduct in this Case.

Mr. Ogbu's criminal history score of one, and his resulting ineligibility for the zero-point offender adjustment available under USSG § 4C1.1, stems from his receipt of probation before judgment for assault in the second degree before the District Court of Maryland for Montgomery County. *See* PSR ¶¶ 77, 80-81. Under Maryland law, such a disposition is not considered a conviction. *See* Md. Code Ann., Crim. Proc. § 6-220(i)(3) (explaining that a defendant's discharge upon his or her completion of probation before judgment "shall be without judgment of conviction and is not a conviction for the purpose of any disqualification or disability imposed by law because of conviction of a crime"). The Guidelines, however, treat "diversionary disposition[s] resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial proceeding . . . as a sentence under § 4A1.1(c) even if a conviction is not formally entered[.]" USSG § 4A1.2(f).

If Mr. Ogbu had received the same opportunity for a diversionary disposition in the District of Columbia Superior Court, he would have been afforded either a Deferred Prosecution Agreement or a Deferred Sentencing Agreement ("DSA"), whereby, Mr. Ogbu could have had his case dismissed, including the withdrawal of any guilty plea in the case of a DSA. As a result, Mr. Ogbu would have been eligible for the zero-point offender reduction, which would have reduced his guidelines range in this case by two levels, to 21 to 27 months, as set forth in the parties' plea agreement. *See* PSR ¶ 7.

It is also noteworthy that Mr. Ogbu's probation before judgment comes just within the ten-year window for prior conduct to be afforded criminal history points. Moreover, if Mr. Ogbu had gotten the probation before judgment expunged, it would not have counted and he would have been eligible for the zero-point offender reduction. *See*, *e.g.*, USSG § 4A1.2(j) (not counting expunged offenses).

For these reasons, notwithstanding the classification of Mr. Ogbu's probation before judgment under the Guidelines, Mr. Ogbu's disposition in this case will be his first criminal conviction, and he should be afforded leniency as a first-time offender for a non-violent offense. Such treatment is consistent with General Garland's concerns regarding reducing mass incarceration, especially for first time offenders convicted of non-violent offenses. *See General Department Policies Regarding Charging, Pleas, and Sentencing*, Office of the Attorney General (Dec. 2022), available at https://www.justice.gov/d9/2022-12/attorney_general_memorandum_-_general_department_policies_regarding_charging_pleas_and_sentencing.pdf (last visited October 21, 2024).

Moreover, as part of his cooperation in this case, Mr. Ogbu had to accept and acknowledge all of his wrongful conduct and agree to the Government's requested enhancements under the

Guidelines. He noted that when questioned by the FBI at his home, where his children reside, during the execution of a search warrant and without the assistance of counsel, he did not give a complete and full accounting of all facts underlying the conduct charged in this case. This should not come as a shock to anyone, including this Court, as defendants routinely fail to provide full debriefs to law enforcement in the initial stages of investigations, before they have obtained the advice of counsel, or the protections afforded by an agreement with the Government. What is relevant is that once Mr. Ogbu began debriefing with the Government with the assistance of counsel, he provided complete and truthful information that assisted the Government in its investigation.

Additionally, while prevented from challenging the applicability of the enhancement under § 3C1.1, for obstructing or impeding the administration of justice, Mr. Ogbu notes that the enhancement has been applied either because of conduct that occurred during the offense conduct, *i.e.*, fraud, by which its very nature implies deceitful conduct, or because of Mr. Ogbu's refusal to accept full responsibility when interviewed at his residence during the execution of a search warrant. *See* PSR ¶ 60. This second type of conduct, however, in and of itself does not establish obstruction under the Guidelines. *See*, *e.g.*, *United States v. Jesus Soto Parra*, 111 F.4th 651, 658 (5th Cir. 2024) (finding unsworn inaccurate statements in response to initial police questioning not to support a guidelines enhancement for "obstruction of justice"). In any event, neither Guidelines provision referenced in the PSR would justify not affording Mr. Ogbu credit for his complete acceptance of responsibility in this case, and application of the § 3C1.1 enhancement further overstates the Guidelines range in this case.

If Mr. Ogbu had received a zero-point offender reduction and the obstruction enhancement was not applied, Mr. Ogbu's offense level would have been level fourteen, with a guidelines range

of 15 to 21 months. This does not take into consideration the Government's request for a departure under the Guidelines, given Mr. Ogbu's substantial assistance as part of his cooperation, or the fact that Mr. Ogbu's guidelines are generally driven by the loss amount, which led to a ten-level increase in the guidelines range, pursuant to USSG §2B1.1(b)(1)(F).

Notably, the loss guideline has been the subject of intense scrutiny. *See*, *e.g.*, *United States v. Corsey*, 723 F.3d 366, 377-78 (2d Cir. 2013) (Underhill, J., concurring) (stating "the loss guideline is fundamentally flawed" and "sentences in high-loss cases will remain wildly divergent as some district judges apply the loss guideline unquestioningly while others essentially ignore it"); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("The Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data. Take the hypothetical but typical case . . . involving a [] defendant who . . . caus[ed] [] shareholders to [] suffer a reduction of more than $12.5 million in the value of their shares. In 1987, such a defendant would have faced a Guidelines sentence of 30–37 months; but by 2003, the same defendant would have faced a Guidelines sentence of 151–188 months, a more than 500% increase. . . . Was such a crime really 500% worse in 2003 than it was in 1987?"); *United States v. Adelson*, 441 F. Supp. 2d 506, 510, 515 (S.D.N.Y. 2006) (noting that calculations under the Guidelines "have so run amok that they are patently absurd on their face," due to the "kind of 'piling-on' of points for which the guidelines have frequently been criticized").

For all of these reasons, Mr. Ogbu's guidelines range overstates his criminal history and conduct in this case, and a variance is appropriate.

ii.       **Defendant's History and Characteristics and the Nature and Circumstances of the Offense.**

Mr. Ogbu is by all accounts a kind-hearted, dedicated, and enterprising individual with a family and friends who love and support him. *See* Exs. 2-9. Mr. Ogbu's only prior brush with the criminal justice system occurred more than ten years ago and he received probation before judgment, which is not considered to be a conviction under Maryland law. He is not a violent person and poses no danger to society, as evidenced by the Government's willingness to let him live by himself in the community since his arraignment and plea hearing earlier this year.[2]

Mr. Ogbu's acceptance of responsibility and desire to become a law-abiding citizen is demonstrated by his response to his arrest on federal charges. As discussed above, Mr. Ogbu began cooperating with law enforcement almost immediately and provided substantial assistance to the Government. He agreed to plead guilty and enter into a formal cooperation agreement at his initial court appearance. Mr. Ogbu's substantial assistance, as acknowledged by the Government's departure motion, also warrants a substantial reduction under the Guidelines.

Mr. Ogbu further agreed to pay significant restitution to the WMATA and the District of Columbia, and to forfeit two of his vehicles.[3] Allowing Mr. Ogbu to find new employment so that

---

[2] Mr. Ogbu's probation before judgment for simple assault ten years ago does not change that analysis. To avoid having his sons dragged into that proceeding during a bitter divorce, Mr. Ogbu accepted a disposition of probation before judgment. While not choosing to relitigate the past, Mr. Ogbu's absence of nothing more than a traffic ticket in over ten years, and the letters of support from his close friends, including *his former wife*, confirm that Mr. Ogbu is neither a violent person nor a danger to the community.

[3] One of the vehicles subject to forfeiture, the black Ford Bronco Sport (*see* PSR ¶ 10) is used and controlled exclusively by Mr. Ogbu's codefendant, Ms. Crowell, even though it is in Mr. Ogbu's name. After she failed to make payments on the vehicle, as they had previously agreed, Mr. Ogbu paid the remaining balance on the loan to prevent the vehicle from being repossessed. This payment further illustrates Mr. Ogbu's commitment to accepting responsibility and honoring his restitution and forfeiture obligations.

he can meet his restitution obligations and continue to provide for his sons will benefit the community far more than his confinement in a federal correctional facility at taxpayer expense.

### iii. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment.

Mr. Ogbu does not dispute the seriousness of his actions. *See* PSR ¶ 64; Ex. 1. When considered together with his felony conviction, and significant restitution and forfeiture obligations, a term of supervision in lieu of incarceration is, however, sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

### iv. Adequate Deterrence (Specific and General).

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. *See* 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). In this case, neither goal is achieved by incarcerating Mr. Ogbu.

As for specific deterrence, the personal and reputational consequences Mr. Ogbu has suffered because of his prosecution and conviction are more than sufficient to discourage him from engaging in similar conduct. He was required by brick-and-mortar banks to close his accounts with them given the nature of the investigation and prosecution in this case. Indeed, because of his felony conviction, Mr. Ogbu will lose many of the rights he worked hard to obtain by becoming a citizen of this country, including his right to vote. Nothing about Mr. Ogbu's current offense indicates that he is any threat to the safety of the community, and his many months in the community while on pretrial release confirm as much. Additionally, Mr. Ogbu has taken steps to work to improve himself, through counseling and community service, and recognizes the importance of continuing to improve, both for himself and for his sons.

As for general deterrence, the publicity of the prosecution and conviction also serves as a significant general deterrence. *See, e.g.*, *Wayte v. United States*, 470 U.S. 598, 607 (1985) (observing that any prosecution has a "general deterrence value"); *United States v. Gamarra*, 940 F.3d 1315, 1321 (D.C. Cir. 2019) (observing that prosecution itself provides general deterrence). The case has received attention from press releases issued by Governmental entities,[4] as well as the local press,[5] and will remain as a blemish on the record of Mr. Ogbu and his coconspirators. The reputational and financial penalties will discourage other individuals from engaging in similar conduct. Moreover, the wholehearted and substantial assistance Mr. Ogbu provided to the Government as part of his acceptance of responsibility counterbalances the need for general deterrence for his actions.

### v.        Kinds of Sentences Available.

A sentence of incarceration is not always necessary to satisfy this sentencing mandate. Indeed, as observed by the district court in *Gall v. United States*, probation (or post-release supervision), "rather than an act of leniency, is a substantial restriction of freedom." 552 U.S. 38, 44 (2007) (punctuation omitted). The *Gall* Court emphasized that the defendant would have to "comply with strict reporting conditions[.]" *Id.* The Court also noted that the defendant would "not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his

---

[4]   *See*, *e.g.*, https://www.justice.gov/usao-dc/pr/federal-government-employee-pleads-guilty-conspiring-defraud-local-agencies-benefit-his (last visited October 21, 2024); https://www.justice.gov/usao-dc/pr/former-public-official-pleads-guilty-conspiracy-commit-wire-and-honest-services-fraud (last visited October 21, 2024).

[5] *See*, *e.g.*, https://www.washingtonpost.com/opinions/2024/08/21/trayon-white-bribery-charge-dc-government-watchdogs-missing/ (last visited October 21, 2024); https://hoodline.com/2024/06/former-d-c-official-bridgette-crowell-pleads-guilty-to-wire-and-honest-services-fraud-sentencing-set-for-september/#google_vignette (last visited October 21, 2024).

Probation Officer or, perhaps, even the Court." *Id.*

This Court may also consider a sentence with a period of home detention, which has been

defined by the Guidelines as:

> [A] program of confinement and supervision that restricts the defendant to his place
> of residence continuously, except for authorized absences, enforced by appropriate
> means of surveillance by the probation office. When an order of home detention is
> imposed, the defendant is required to be in his place of residence at all times except
> for approved absences for gainful employment, community service, religious
> services, medical care, education or training programs, and such other times as may
> be specifically authorized. Electronic monitoring is an appropriate means of
> surveillance and ordinarily should be used in connection with home detention.
> However, alternative means of surveillance may be used so long as they are as
> effective as electronic monitoring.

USSG § 5F1.2, Commentary, n.1.

Based upon the information contained in this submission and given the mandate of 18

U.S.C. § 3553(a)(3) for the Court to consider "the kinds of sentences available," a community

service order would also satisfy the goals of sentencing. A 2001 publication of the Administrative

Office of the United States Courts described community service as "a flexible, personalized, and

humane sanction," and "offers a way for the offender to repay or restore the community." *Court

& Community: An Information Series About U.S. Probation & Pretrial Services: Community

Service*, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court (Feb.

2001), available at https://www.nhp.uscourts.gov/sites/nhp/files/ccservice.pdf (last visited

October 21, 2024). It is "practical, cost-effective, and fair — a 'win-win' proposition for everyone

involved." *Id.* It is also recognized that "[c]ommunity service addresses the traditional sentencing

goals of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal

liberty[,] . . . allows offenders to atone or 'make the victim whole' in a constructive way[, and] . . .

may be regarded as . . . a form of symbolic restitution when the community is the victim." *Id.* In

selecting an appropriate candidate to perform community service, United States Probation

recommends as follows:

> Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service. . . . Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.

*Id.*

As discussed below, Mr. Ogbu requests and recommends a term of supervision in lieu of incarceration. This Court could also impose a requirement of community service and home confinement in lieu of incarceration so that Mr. Ogbu can continue the successful efforts that he has made to turn his life back around and to once again be a productive member of society.

### vi.        The Need to Avoid Unwarranted Sentence Disparities.

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

This Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself. *Kimbrough*, 552 U.S. at 108. Recent Department of Justice ("DOJ") prosecutions in this District and the District of Maryland (where Mr. Ogbu resides) involving similar, if not worse, conduct than alleged here regularly result in below-guidelines sentences and none of them involved cooperation and

substantial assistance to the Government:

- **Marilyn Mosby**, the former Baltimore City's State's Attorney, for whom the Government sought 20 months of incarceration for "mortgage fraud and perjury," was sentenced to three years of probation (1:22-cr-7-LKG (D. Md.));

- **Leonardo Silva**, who, as a DEA Special Agent in Monterrey, Mexico, was prosecuted for providing false information that caused two Mexican citizens to have their visas revoked in exchange for post-retirement employment, as well as, submitting false financial disclosure reports, was sentenced to two years of probation (No. 16-cr-69-TFH (D.D.C. 2017));

- **Gloria Dickinson**, who, as a FERC employee and elected Treasurer of Local 421 of the American Federation of Government Employees, was prosecuted for embezzling $21,713 of federal-employee union funds and filing false reports with the Department of Labor to cover it up, was sentenced to five years of probation (No. 12-cr-00197-BAH (D.D.C. 2012));

- **Martin Lieb**, who, as a DOD employee, was prosecuted for failing to disclose on his financial disclosure form gifts — including a ticket to the Super Bowl, lodging on a cruise ship, and meals and drinks — from a company that had secured DOD contracts worth hundreds of millions of dollars, was sentenced to two years of probation (No. 1:10-cr-00144-RBW (D.D.C. 2010));

- **Courtney Stadd**, who, as a former NASA Chief of Staff, was prosecuted for steering millions of dollars of earmarked funds for a NASA initiative to benefit a university with which she had a consulting agreement, increasing her own consulting fees as a result, was sentenced to three years of probation (No. 09-cr-65-RMC (D.D.C. 2009));

- **Craig Colbert**, who for ten years converted his deceased father's retirement benefits ($216,290) to his own use was sentenced to four years of probation, including nine months of home detention (19-cr-093-GJH (D. Md.));

- **Gloria Wilson**, who improperly received her stepmother's social security benefits for 17.5 years ($176,874), was sentenced to three years of probation, including eight months of home detention and 100 hours of community service (15-cr-0633-CCB) (D. Md.));

- **Keisha Jones**, who engaged in social security fraud by obtaining improper benefits ($145,044) for 20 years, was sentenced to three years of probation, including one year of home detention (18-cr-0590-RDB (D. Md.));

- **Leroy Kamzura**, who engaged in federal employees' compensation fraud and social security fraud by obtaining benefits ($177,132) while failing to report active employment for a period of seven years, was sentenced to one year of probation on home detention (18-cr-0582-CCB (D. Md.));

- **Betty Ann Garner-Newby**, who stole retirement annuity payments for a deceased victim for 25 years was sentenced to 3 years' probation to include 18 months of home detention and approx. $325,000 restitution (19-cr-157-PWG (D. Md.));

- **Frederick Kellner**, who engaged in converting parents' retirements to defendant's own use for nearly 27 years, was sentenced to 5 years' probation to include 6 months of home detention and approx. $357,000 restitution (19-cr-267- DKC (D. Md.)).

Moreover, in a cursory review of published sentences nationwide, district court judges have pushed back on Government requests for incarceration for PPP-related wire fraud and have sentenced defendants to lengthy terms of supervision (with periods of home confinement) and appropriate restitution judgments.

In *United States v. Brandon Fitzgerald-Holley*, No. 21-cr-00250-GJH (D. Md.), the defendant used a non-operational nonprofit to obtain PPP funds, even though the company had no employees, income, or regular operations. *See* Press Release, https://www.justice.gov/usao-md/pr/nonprofit-ceo-pleads-guilty-wire-fraud-relation-covid-19-loan-fraud (last visited October 21, 2024). After a prior loan application to the SBA had been denied, the defendant created and submitted fraudulent documents, including an IRS Form W-3, which falsely stated that the company had twenty-five (25) employees with total wages of $1,385,000. As stated in his plea agreement, the defendant used the fraudulently obtained funds to purchase personal items, including clothing, a pool table, televisions, electronic equipment, a 2020 Dodge Charger, and various accessories for the vehicle; and to fund a vacation rental. In total, the defendant misappropriated $305,854 in PPP loan funds. As the loan amount was lower than a million dollars, the defendant's advisory sentencing guidelines range was 21 to 27 months. Even with this conduct and a guidelines range of 21 to 27 months, the Court sentenced the defendant in *Fitzgerald-Holley* to six months of incarceration. Here, separate from Mr. Ogbu's substantial assistance to the Government, the loss amount is significantly lower and, rather than outright stealing government

funds, Mr. Ogbu and his coconspirators provided services under the contracts that they were improperly awarded.

In *United States v. Dana Hayes*, No. 22-cr-0224-GLR (D. Md.), the defendant made multiple applications for PPP loans and Economic Injury Disaster ("EID") loans for an inactive company, based on false information as to revenue, employees, and activities, and also failed to disclose that he was under supervision for a prior stolen gun possession conviction that made him ineligible for the loan programs. The defendant was also the Chief of Fiscal Services with the Baltimore City Police Department during the time of his conduct, but was fired after being put under supervision for allegedly murdering his stepfather. Because the defendant only obtained $50,036, and even though he transferred all the PPP funds from the corporate account where they were deposited to his personal account, his offense level on the charge of wire fraud was only offense level 11, with an advisory guidelines range of 8 to 14 months. Notwithstanding these facts and the defendant's prior criminal history, the Court sentenced the defendant in *Hayes* to three years of supervised probation and four weekends of intermittent confinement.

In *United States v. Sherrie Bryant*, No. 22-cr-00308-DLB (D. Md.), the defendant pleaded guilty to wire fraud after submitting fraudulent PPP and EID loan applications for a business whose stated purpose was to provide mentorship and education to underserved youth. The defendant repeatedly misrepresented that she had never been convicted of a crime and ultimately obtained $419,100 in fraudulent loans proceeds, which were used in part to pay for a car, a boat, a vacation, and tickets to sporting events. The case represented the defendant's third federal fraud conviction, and the defendant was on federal supervised release at the time of her PPP fraud. Given the loss amount, the defendant's offense level conduct was only level 16, with an advisory guidelines range of 27 to 33 months of incarceration, due to her Category III criminal history score. Notwithstanding

the defendant's lengthy criminal history and having committed the offense while on supervision for another federal fraud conviction, the Court sentenced the defendant to twelve months on the current wire fraud to run consecutive to six months for the violation of supervision. This conduct is far more egregious than the conduct alleged here, and yet the defendant's sentence was far below what the Government is seeking in the sentencing of the conspirators in this matter.

Separate from decisions in this Court, as explained in detail below, district courts nationwide have pushed back on the Government's request for incarceration for offenses relating to PPP fraud as part of DOJ's focused national task force priority on prosecuting these offenses.

In *United States v. Janet Jenison*, Chief United States District Judge Algenon L. Marbley in Columbus, Ohio sentenced the defendant to five years of probation, including six months of home confinement, for multiple counts of wire fraud and making a false statement to law enforcement relating to PPP fraud. The defendant submitted three fraudulent applications and sought nearly $300,000 in federal PPP financing for a marketing business registered under her maiden name. The defendant received approval on two applications totaling $160,247 in funding after she submitted false payroll and other documentation. The defendant also created false bank account statements for her business, showing withdrawals for payroll, tax withholding, and business expenses, even though the business account was not open during the relevant period. Further, the defendant submitted false tax documents, including one classifying her marketing business as a corporation, when the employer tax identification number on the form was not created until four months later. She also submitted documents falsely claiming she had made federal employment tax deposits for employees when she had not. The Government sought a 21-month prison term, plus fines and restitution, but the district court sentenced the defendant to probation and home confinement (No. 2:21-cr-90, S.D. Ohio).

In *United States v. Malik Breckenridge*, the defendant applied for and obtained two PPP loans on behalf of his purported business, which was not a registered business entity and was not engaged in substantial or legitimate business activity. The defendant admitted that he falsely stated that the company was established in 2014 and had been operating at the time the loans were sought. The defendant further admitted that he submitted false IRS forms showing that the company had earned $180,489 in gross income during 2019. The defendant was sentenced to five years of probation, including eight months on home detention, on the sole count of wire fraud (No. 2:22-cr-84, S.D. W.V.) (https://www.justice.gov/usao-sdwv/pr/charleston-man-ordered-pay-restitution-covid-19-relief-fraud-scheme).

In *United States v. Tarshauna Thomas*, the defendant, a BOP correctional guard, claimed to be the sole proprietor of a dog breeding and sitting service, "Shaunas Little Pooches," when applying for two PPP loans. While approved for both PPP loans, she received payment from only one lender. The payment was electronically deposited into the defendant's personal bank account and spent on personal, non-business-related expenses. The defendant was sentenced to three years of federal probation and ordered to pay restitution (No. 3:22-cr-00086-DCB-FKB, S.D. Miss.) (https://oig.justice.gov/news/press-release/former-bop-correctional-officer-pleaded-guilty-wire-fraud-after-submitting-two); (https://www.justice.gov/usao-sdms/pr/former-bop-correctional-officer-sentenced-committing-covid-relief-fraud).

In *United States v. David Andrew Butziger*, the defendant assisted his codefendant in applying for PPP loans for three restaurants that had no employees at all (and one of which his codefendant had no ownership interest in at all). The defendant also submitted a PPP loan application in his own name on behalf of an unincorporated entity that he called Dock Wireless. The loan application was in the amount of $105,381.50 and fraudulently represented that Dock

Wireless had seven employees and an average monthly payroll of $42,152.60. In reality, the company had no employees and no wages were ever paid. In total, the defendant and his codefendant submitted four fraudulent PPP loans applications totaling $543,959. While the applications were pending, a concerned citizen aware of their fraudulent nature brought them to the attention of law enforcement, which ultimately led to the denial of their loan applications. The defendant's guidelines range was 21 to 27 months and the Government asked for a sentence of 21 months. The district court placed the defendant on three years of supervised release, the first six months to be served in home confinement with electronic monitoring and ordered the defendant to pay a fine of $5,000. The defendant was on pretrial release during the entirety of the case and his sentence was more akin to a sentence of probation than supervised release (No. 20-072-MSM, D.R.I., D.E. 35 (Gov't Sentencing Memorandum)) (https://www.justice.gov/usao-ri/pr/rhode-island-man-sentenced-covid-19-related-fraud-scheme).

In *United States v. Jeremy Sanders, et al.*, defendants Jeremy and Lakeda Sanders — husband and wife — were sentenced to probationary sentences with brief periods of home confinement after they worked with others to prepare and submit loan applications that misrepresented payroll for their purported businesses and sole proprietorships. The businesses, in fact, had no employees and the PPP applications were supported by false tax documents. Mr. Sanders and an Omaha-based co-conspirator submitted fraudulent applications for loans totaling approximately $41,290, and he personally obtained $20,690. Mrs. Sanders and a co-conspirator submitted fraudulent applications for loans totaling approximately $220,000, and she personally obtained $24,166 (No. 21-cr-00253-RFR-SMB, D. Neb.) (https://www.justice.gov/usao-ne/pr/georgia-couple-sentenced-paycheck-protection-program-fraud).

In *United States v. Alexis Ransom*, the defendant was sentenced to five years of probation

after fraudulently applying for three PPP loans for her purported business, Alexis Renae Ransom, which she claimed did business under the tradenames of Renae's Fashion Consulting LLC and Momma & Me Boutique. The defendant admitted that she falsely stated that Renae's Fashion Consulting LLC was established in 2019 and had earned $66,900 in gross income in 2019 and 2020, and that Momma & Me Boutique earned $69,000 in gross income in 2019. The investigation revealed that the defendant's purported business and its tradenames had not engaged in substantial business activity before February 15, 2020. The defendant further admitted that she submitted a false IRS form in connection with the first loan application she submitted for Renae's Fashion Consulting LLC (No. 2:22-cr-122, S.D.W.V.) (https://www.justice.gov/usao-sdwv/pr/logan-county-woman-sentenced-covid-19-relief-fraud-scheme).

In each of these above-referenced cases, located in a quick Google search, the defendants applied for PPP loans for which they were ineligible and for companies that did not exist, and the proceeds were used exclusively for personal purposes. In all instances, the defendants did not serve a day in jail. None of those predicate facts exist in this case, where Mr. Ogbu provided substantial assistance to the Government and, rather than steal money, provided services under contracts, though awarded thorough improper means.

Similarly, districts courts throughout the country have not backed down from issuing non-incarceration sentences for non-dangerous, non-violent offenses even when the Government sought jail sentences, merely as a form of deterrence:

- **Turab Lookman**, who was prosecuted as a former scientist from Los Alamos National Laboratory for making false statements regarding his involvement with a Chinese government technology program — stating he had not been recruited by the Chinese program when he in fact had — was sentenced to five years of probation (No. 1:19-cr-01439-WJ (D.N.M. 2020));

- **Andrew Siemaszko**, who was prosecuted as an employee of a nuclear power station and who made false statements to the Nuclear Regulatory Commission regarding the condition

and maintenance of equipment at the power plant, was sentenced to three years of probation (No. 3:06-cr-00712-DAK-3 (N.D. Ohio 2009));

- **Randall Barker**, who was prosecuted for failing to report the full amount of income from his business from 2011 to 2014, admitting to taking direct payments from customers, removing cash from business deposits, and altering invoices to show less income for the business, was sentenced to one year of probation (No. 18-cr-10152 (EFM) (D. Kan. Jul. 31, 2019)) (https://www.justice.gov/usao-ks/pr/flooring-store-owner-sentenced-tax-evasion);

- **Lawrence P. Stephenson**, who was prosecuted for tax evasion, began diverting portions of his practice's business receipts by depositing checks from insurance carriers and patients into a personal bank account, failed to report approximately $1.2 million dollars paid to his dental practice and deposited it elsewhere, thus failing to pay taxes due the IRS, was sentenced to three years of probation and 280 hours per year of community service (No. 18-cr-73 (D.R.I. Nov. 14, 2018)) (https://www.justice.gov/usao-ri/pr/north-providence-dentist-sentenced-tax-evasion-0);

- **Ty Warner**, the creator of Beanie Babies, who was prosecuted for failing to report more than $24.4 million in income, and evading nearly $5.6 million in federal taxes from millions of dollars he hid for more than a decade in secret foreign financial accounts at two banks based in Switzerland, was sentenced to two years of probation (No. 13-cr-731 (CPK) (N.D. Ill. Jan. 14, 2014)) (https://www.justice.gov/usao-ndil/pr/h-ty-warner-sentenced-probation-after-paying-80-million-taxes-and-penalties-tax-evasion);

- **Jacques Wajsfelner**, who worked in real estate and advertising, held a Swiss bank account valued at over $5 million, and owed more than $400,000 in back taxes, interest, and penalties, was sentenced to three months of home detention (No. 12-cr-641 (NRB) (S.D.N.Y. Mar. 8, 2013));

- **Josephine Bhasin**, who had an account at HSBC in India that held a high balance of $8.3 million, and filed a false Report of Foreign Bank and Financial Accounts ("FBAR") after being contacted by the DOJ, was sentenced to two years' probation, the first three months to be served in home confinement, and 150 hours of community service (No. 11-cr-268 (ADS) (E.D.N.Y. Mar. 8, 2013));

- **Arvind Ahuja**, who was convicted in a jury trial of willfully filing a false return and willfully failing to file an FBAR due to a failure to disclose more than $8.5 million held in bank accounts at HSBC India, was sentenced to three years of probation, three months of home detention, a $350,000 fine, and 450 hours of community service, after the court varied from the Guidelines range of 41 to 51 months (No. 11-cr-135 (CNC) (E.D. Wisc. Feb. 6, 2013));

- **Lothar Hoess**, the owner of a company that sold office supplies and equipment, who had a tax loss of between $400,000 and $1,000,000, and faced a Guidelines' range of 30 to 37

months, was sentenced to three years of probation (No. 11-cr-154 (SM) (D.N.H. Mar. 30, 2012));

- **Arthur Joel Eisenberg**, who was prosecuted for filing a false income tax return and failing to report that he had an interest in or signature authority over financial accounts at UBS AG, where at the end of 2004, the total balance of Eisenberg's various UBS financial accounts exceeded $3.1 million, was sentenced to three years of probation (No. 10-cr-00369-JCC (W.D. Wash. Mar. 4, 2011));

- **Harry Abrahamsen**, who was prosecuted for failing to file a FBAR and concealing more than $1 million in Swiss bank accounts, was sentenced to three years of probation, including twelve months of home confinement with electronic monitoring (No. 10-cr-254 (D.N.J. May 24, 2011)) (https://www.justice.gov/opa/pr/new-jersey-ubs-client-sentenced-failing-report-more-1-million-swiss-bank-account);

- **Michael Reiss**, who moved his offshore account to various institutions and countries, failed to participate in the IRS's offshore voluntary disclosure program, and filed false FBARs, and faced a Guidelines' range of 30 to 37 months, was sentenced to three years of probation, the first eight months to be served in a community confinement center, and 30 hours of community service a week for three years (No. 11-cr-668 (RMB) (S.D.N.Y. Jan. 1, 2011));

- **Ernest Vogliano**, who opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations, and actively used funds and transferred some after learning of the criminal investigation, was sentenced to two years of probation (No. 10-cr-327 (TPG) (S.D.N.Y. Apr. 26, 2011));

- **Jules Robbins**, who created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts that held nearly $42 million, was sentenced to twelve months of probation because the court took into consideration his "otherwise unblemished life" (No. 10-cr-333 (RJH) (S.D.N.Y. Oct. 8, 2010));

- **Paul Zabczuk**, who instructed clients to make payments to him through undisclosed accounts in Switzerland and the Bahamas, was sentenced to three years of probation, twelve months of home detention, and community service (No. 10-cr-60112 (WPD) (S.D. Fla. July 26, 2010));

- **John McCarthy**, who transferred over $1,000,000 to an unreported Swiss bank account and communicated with bank representatives to orchestrate various transactions, was sentenced to three years of probation with six months of home detention and 300 hours of community service (No. 09-cr-784 (VBF) (C.D. Cal. Mar. 22, 2010));

- **Juergen Homman**, who failed to disclose a Swiss account holding approximately $5 million, was sentenced to five years of probation and community service (No. 09-cr-724 (SRC) (D.N.J. Jan. 6, 2010));

- **Steven Rubinstein**, who hid approximately $7 million in unreported Swiss accounts that he used to invest in real estate, was sentenced to three years of probation with twelve months of home detention (No. 09-cr-60166 (MGC) (S.D. Fl. Oct. 28, 2009)); and

- **Igor Olenicoff**, a businessman and investor, who held more than $200 million in undisclosed offshore bank accounts and owed $52 million in back taxes, interest, and penalties, was sentenced to two years of probation (No. 07-cr-227 (CJC) (C.D. Cal. Apr. 16, 2008)).

Consistent with all of these prior sentences, Mr. Ogbu should receive a non-custodial sentence.[6]

## II.    Sentencing Request and Recommendation.

### A.    Probation.

Considering Mr. Ogbu's substantial assistance to the Government in the prosecution of his coconspirators and development of additional investigative leads (which led the Government to obtain approval from the United States Attorney's Office's Departure Committee for a departure under the Guidelines), Mr. Ogbu respectfully asks this Court for a sentence of probation in lieu of incarceration.[7]

---

[6] A non-custodial sentence would also avoid a sentencing disparity between Mr. Ogbu and his coconspirator, Ms. Crowell. On October 21, 2024, the Court sentenced Ms. Crowell to seven months of incarceration plus two years of supervised release, far below her guidelines range of 21 to 27 months. At the sentencing hearing, the Court acknowledged that the guidelines range was driven by the loss amount, which is a basis for a variance. The Court, however, emphasized the seriousness of the offense and the harm to the citizens of DC and the District's reputation. Additionally, both the Court and the Government made clear that Ms. Crowell was equally as culpable as her conspirators. If the coconspirators are considered to be equally culpable in the offense conduct, Mr. Ogbu should receive a non-custodial sentence in light of his substantial assistance to and cooperation with the Government.

[7] United States Probation recommended a sentence of 18 months of incarceration, followed by three years of supervised release. *See* Sentencing Recommendation (D.E. 15). Although the recommendation is made without any knowledge of Mr. Ogbu's cooperation whatsoever and the Government's motion for a downward departure under the Guidelines, United States Probation still agreed that a variance is appropriate. Nevertheless, United States Probation's recommendation of probation for Ms. Crowell, who facilitated and encouraged the business dealings in the conspiracy, is inconsistent with its recommendation of 18 months of incarceration for Mr. Ogbu.

A term of supervision is determined by reviewing many of the same § 3553(a) factors already considered above, including, relevant here: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for deterrence, to protect the public, and provide treatment to the defendant; (iii) the available sentences and sentencing range; (iv) relevant policy statements by the Sentencing Commission; and (v) the need to avoid sentencing disparities. *See* 18 U.S.C. § 3583(c). Accounting for these factors, as addressed above, Mr. Ogbu recommends a three-year period of supervision including the "standard" conditions recommended by the Guidelines (*see* USSG § 5D1.3(c)). The conditions of supervised release will significantly restrict Mr. Ogbu's liberty and provide a daily reminder of his criminal conduct by requiring that he, among other things:

- regularly report to his probation officer;
- seek permission from the Court or his probation officer to leave Maryland;
- respond truthfully to questioning by his probation officer;
- live in an approved residence and notify his probation officer of any address change;
- allow his probation officer access to his residence;
- work fulltime and notify his probation officer of any job change;
- refrain from knowingly communicating with criminals;
- notify his probation officer if he is arrested;
- refrain from possessing a firearm or other dangerous weapons; and
- refrain from possessing illegal drugs or alcohol.

A three-year period of supervision, subject to these conditions, will provide adequate punishment and deterrence while allowing Mr. Ogbu to remain a productive member of society.

### B.   Restitution, Forfeiture, and Assessments.

Pursuant to his plea agreement, Mr. Ogbu agreed to pay restitution to the District of Columbia in the amount of $100,000, and to the WMATA in the amount of $50,000. *See* PSR ¶ 9. Apart from these agreed-upon amounts, Mr. Ogbu also acknowledges that the Court has an obligation to determine whether, and in what amount, mandatory restitution applies in this case

under 18 USC § 3663A. *Id.* Mr. Ogbu further agreed to forfeit two vehicles purchased in October of 2021 and December of 2022. *Id.* ¶ 10.

Mr. Ogbu resigned from his position with WMATA due to his arrest in the instant offense. *See* PSR ¶ 106. While he receives a small monthly interest income, his total monthly expenses greatly exceed his monthly cash flow, due in part to his role in supporting his two sons. *See id.* ¶¶ 112, 114. As noted in the PSR, due to his financial condition and restitution obligation, Mr. Ogbu likely does not have the ability to pay a fine in this case. *Id.* ¶ 121.

Considering the foregoing, Mr. Ogbu respectfully requests that the Court decline to impose a fine or any additional restitution as part of Mr. Ogbu's sentence.

## CONCLUSION

For the foregoing reasons and others that may appear to the Court or may develop at the sentencing hearing, Mr. Ogbu respectfully requests that this Court impose a sentence of three years of supervision, with a period of community service and/or home confinement, in addition to the agreed-upon forfeiture of two vehicles and restitution of $100,000 to the District of Columbia and $50,000 to the WMATA.

Dated: October 21, 2024

Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

/s/ Christopher Macchiaroli
Christopher Macchiaroli (D.C. Bar No. 491825)
1775 I Street, NW, Suite 1150
Washington, D.C. 20006
Telephone: (202) 539-2444
Facsimile:  (410) 547-2432
Email: cmacchiaroli@silvermanthompson.com

*Counsel for Defendant Obinna Ogbu*